**SECOND DIVISION**
**BARNES, P. J.,**
**RICKMAN and SELF, JJ.**

**NOTICE:** Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**January 24, 2017**

# In the Court of Appeals of Georgia

A16A1801. LASTER v. THE STATE.

RICKMAN, Judge.

Following a jury trial in 2014, Richard Earl Laster was convicted of child molestation and sexual battery against a child under the age of 16.[1] He filed a motion for new trial, which the trial court denied. Laster contends on appeal that the trial court erroneously: (1) overruled his objection to the hearsay testimony of several witnesses who took to the witness stand before the child victim and who relayed statements made to them by the child victim; and (2) instructed the jury that, as to the offense of sexual battery, a child under the age of 16 lacks the legal capacity to

---

[1] Laster was found guilty of a second count of sexual battery against a child under the age of 16; however, that count merged into Laster's child molestation conviction for sentencing purposes.

consent to sexual conduct. For the following reasons, we reverse Laster's conviction of sexual battery. We affirm in all other respects.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to support the jury's verdict, and the defendant no longer enjoys a presumption of innocence. We do not weigh the evidence or judge the credibility of the witnesses, but determine only whether the evidence authorized the jury to find the defendant guilty of the crimes beyond a reasonable doubt in accordance with the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LEd2d 560) (1979).

*Bledson v. State*, 337 Ga. App. 444 (787 SE2d 809) (2016).

So construed, the evidence adduced at trial showed that Laster and his wife were close friends of the victim's family, and that the victim and her little sister used to disembark their school bus at Laster's home and remain there until their mother returned from work. In November 2012, the victim's stepfather discovered sexually explicit text messages that Laster, then 29-years old, had sent to the victim, then 13-years old. The text messages included a reference to Laster's need "to control [himself] around [the victim] . . . so [her mother] don't think anything" and his assertion that he was "the only one who [could] touch the [victim's] Hello Kitty spot and make [her] . . . collapse."

2

The stepfather showed the text messages to the victim's aunt, who questioned the victim about them. The victim admitted to her aunt that Laster had kissed her and had touched her vagina, and stated that Laster was her boyfriend and that they loved each other. The victim later told her mother that she "had feelings" for Laster.

The victim's family alerted law enforcement officials and the victim told the investigating detective that she and Laster "were close," and that he had kissed her and touched her vagina on at least one occasion. The victim was subsequently taken to a children's advocacy center for a forensic interview. There, she revealed to the forensic interviewer that she was 12 years old when Laster began touching her intimately. She later elaborated that the touching began after Laster told her that her stepfather had asked him "to test" her. Over the course of the next several months, Laster repeatedly molested the victim, touching her chest, buttocks, and vagina, the latter of which he referred to as her "Hello Kitty." Although the victim initially considered their relationship to be one of "a father-daughter-type," she grew to believe that Laster loved her intimately, and the two discussed a future marriage. Laster provided the victim with a "secret" cellular phone through which they communicated daily, and at some point, representing himself as "an uncle or like an

uncle," Laster began regularly visiting the victim at school without her parents' knowledge, pulling her out of class for up to an hour-and-a-half at a time.

Laster was subsequently arrested and charged, and the victim testified at trial to events consistent with those set forth above. The victim's mother also testified and identified three letters written by Laster: the first, written to the victim, was sexually explicit and implored the victim to "please, please, please, keep [the cell phone he intended to provide] out of sight"; the second, also written to the victim, included Laster's declarations of love for her, discussed how she was "growing sexier . . . by the hour," and mentioned his excitement about DJ'ing at her impending thirteenth birthday party; and the third, written to the victim's parents after his text messages has been discovered, contained Laster's apology that the "Hello Kitty" text message "didn't look right" and explained that contrary to all appearances, he was simply referring to the victim's Hello Kitty headphones.

Laster testified in his own defense and denied any inappropriate contact with the child. He claimed that the text messages were an innocent misunderstanding, denied that he was the author of the love letters to the victim, and maintained that his visits to the victim's school were merely lunch visits.

The jury convicted Laster of the crimes charged. This appeal follows.

4

1. Laster argues that the trial court erred in overruling his objection to the testimony of the victim's aunt, the victim's mother, and the investigating detective, all of whom took the witness stand before the victim and relayed statements the victim made to them regarding Laster's abuse. Laster contends that the collective testimony bolstered the victim's testimony before her credibility had been challenged.

Generally speaking, "[u]nless a witness's veracity has affirmatively been placed in issue, the witness's prior consistent statement is pure hearsay evidence, which cannot be admitted merely to corroborate the witness, or to bolster the witness's credibility in the eyes of the jury." (Footnotes omitted.) *Woodard v. State*, 269 Ga. 317, 320 (2) (496 SE2d 896) (1998), overruled on other grounds by *Bunn v. State*, 291 Ga. 183-184 (728 SE2d 569) (2012). The Child Hearsay Statute, however, is a legislatively created exception to the general rule prohibiting such hearsay evidence and provides that, so long as certain conditions are met, a statement made by a child describing any act of sexual contact is admissible in evidence by the person to whom the statement was made. See OCGA § 24-3-16 (2012).[2] As such, "the Child

_____

[2] There have been several iterations of the Child Hearsay Statute. This case is governed by OCGA § 24-3-16 (2012), which was in effect at the time Laster committed the offenses. See Ga. L. 2013, p. 222, § 21 (expressly providing that "[a]ny offense occurring before July 1, 2013, shall be governed by the [Child Hearsay Statute] in effect at the time of such offense"). OCGA § 24-3-16 (2012) provided that,

5

Hearsay Statute actually contemplates testimony from both the child and those witnessing the child's later reaction, even if the hearsay may be 'bolstering.'" (Citation and punctuation omitted.) *Ledford v. State*, 313 Ga. App. 389, 391-392 (2) (721 SE2d 585) (2011) ("Any 'bolstering' can be explored by defendant in cross-examination."); see also *Weathersby v. State*, 262 Ga. 126, 128 (4) (A) (414 SE2d 200) (1992).

Here, Laster does not assert that the statutory requirements were not met, and we have previously held that, under OCGA § 24-3-16 (2012), the order of witnesses is irrelevant to the question of the admissibility of child-hearsay evidence. See OCGA § 24-3-16 (2012); *Hilliard v. State*, 298 Ga. App. 473, 477 (4) (a) (680 SE2d 541)

---

[a] statement made by a child under the age of 14 years describing any act of sexual contact . . . performed with or on the child by another . . . is admissible in evidence by the testimony of the person or persons to whom made if the child is available to testify in the proceedings and the court finds that the circumstances of the statement provide sufficient indicia of reliability.

With the adoption of the New Evidence Code, effective January 1, 2013, OCGA § 24-3-16 was repealed and replaced with OCGA § 24-8-820, a nearly identical version of that statute. See Ga. L. 2011, p. 99, § 2. Six months later, OCGA § 24-8-820 was substantially revised. See Ga. L. 2013, p. 222, § 13 (effective July 1, 2013).

(2009) (holding that the trial court did not err in allowing a witness to testify regarding the child victim's hearsay statements prior to the child testifying "because OCGA § 24-3-16 allows testimony about a child's out-of-court statements even in cases when the child does not appear as a witness, as long as the child is available at the trial to testify"). Accordingly, the trial court did not err in allowing the child-hearsay testimony. See OCGA § 24-3-16 (2012); *Hilliard v. State*, 298 Ga. App. at 477 (4) (a).

2. Laster further argues that the trial court erred by instructing the jury, in regard to the offense of sexual battery, that a child under the age of 16 lacks the legal capacity to consent to sexual conduct. We are constrained to agree.

After instructing the jury that "[a] person commits sexual battery when that person intentionally makes physical contact with the primary genital area and/or the buttocks of another person without consent of the other person," see OCGA §16-6-22.1 (b), the trial court further charged that "[u]nder Georgia law, a person under the age of 16 lacks legal capacity to consent to sexual conduct."

Although the charge was a correct statement of the law at the time it was given, following the trial, the Supreme Court of Georgia held that the crime of sexual battery "require[s] actual proof of the victim's lack of consent, regardless of the victim's

age." See *Watson v. State*, 297 Ga. 718, 720 (777 SE2d 677) (2015). Thus, the *Watson* Court determined that it is erroneous for a trial court to instruct a jury that an underage victim is not capable of consenting to contact constituting sexual battery. Id. at 720. The instant case was in the appellate "pipeline" at the time *Watson* was decided and, consequently, the *Watson* holding governs our analysis. See *Harris v. State*, 273 Ga. 608, 610 (2) (543 SE2d 716) (2001). We therefore must determine whether the charge was harmless, i.e., whether it is highly probable that the erroneous charge did not contribute to the jury's verdict. See *Johnson v. State*, 238 Ga. 59, 61 (230 SE2d 869) (1976); see also *Franks v. State*, 278 Ga. 246, 266 (6) (599 SE2d 134) (2004) (applying the highly probable test to determine whether a jury instruction rendered erroneous by a new rule adopted while the case was in the appellate pipeline constituted reversible error).

Following *Watson*, the trial court's charge "effectively relieved the State of its burden to prove [lack of consent,] an essential element of the crime of sexual battery." *Watson*, 297 Ga. at 720 (2). As such, we cannot say, under the particular facts of this case, that it is highly probable the erroneous instruction did not contribute to the jury's verdict. See generally *Johnson*, 238 Ga. at 61. It follows that we must reverse Laster's sexual battery conviction. See generally *Warren v. State*, 283 Ga. 42, 43–44

8

(4) (656 SE2d 803) (2008); *Cochran v. State*, 276 Ga. 283, 285 (2) (576 SE2d 867) (2003).

*Judgment affirmed in part and reversed in part. Barnes, P. J., and Self, J., concur.*